TWIN FALLS SALMON RIVER LAND & WATER CO. v. TWIN FALLS COUNTY et al.

(District Court, D. Idaho, S. D. March 23, 1916.)

No. 495.

TAXATION ☞234—EXEMPTIONS—CAREY ACT IRRIGATION SYSTEMS—IDAHO STATUTE.

Sess. Laws Idaho 1899, p. 221, as amended by Sess. Laws 1913, p. 173, exempts from taxation "irrigation canals and ditches and water rights appurtenant thereto when no water is sold or rented from any such canal or ditch, only to the extent that the water conveyed by such canal or ditch is used to irrigate lands within this state: Provided that in case any water be sold or rented from any such canal or ditch to irrigate lands within this state, then, and in that event, such canal or ditch shall be assessed for taxation to the extent that such water is so sold or rented." *Held* that, under such statute as construed by the Supreme Court of the state, which construction is binding on the federal courts, a corporation organized for the promotion and construction of an irrigation system under Carey Act Aug. 18, 1894, c. 301, § 4, 28 Stat. 422 (Comp. St. 1913, § 4685), is not taxable upon any part of its system, either as to water rights sold or such as remain unsold.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 381, 382; Dec. Dig. ☞234.]

---

In Equity. Suit by the Twin Falls Salmon River Land & Water Company against Twin Falls County, Idaho, W. J. Young, Treasurer, and E. J. Finch, Auditor and Trustee, of said county. On rehearing. Decree for complainant.

Richards & Haga and McKeen F. Morrow, all of Boise, Idaho, for plaintiff.

A. M. Bowen and A. R. Hicks, both of Twin Falls, Idaho, for defendants.

DIETRICH, District Judge. Broadly speaking, the question is of how far the property embraced in a Carey Act irrigation system is exempt from taxation under the Idaho statutes. The complaint was apparently framed upon the theory that the plaintiff had sold water rights up to the full capacity of its system prior to the making of the assessment, and that therefore it retained no taxable interest, and such was the theory upon which the case was originally submitted. Indeed, until recently, if I am not misinformed, the rule in actual practice has been generally recognized both by Carey Act companies and public officers that to the extent of the unsold portion of the irrigating system, and to that extent alone, such property is subject to taxation. Assuming that to be the correct view of the law, I found in substance that the county officers had attempted to tax only the unsold portion of the plaintiff's system, and that, while it later developed that it had no unsold capacity, it had not conceded such fact at the time, and I therefore held that the finding of the board of equalization was conclusive and the plaintiff was without present remedy in the courts. However, before a decree dismissing the bill was entered pursuant to such conclusion, the Supreme Court of the state decided the case of Idaho Irrigation Co. v. Lincoln County, 152 Pac. 1058, apparently holding that such projects are wholly exempt from taxation, and thereupon the plaintiff filed herein a petition for rehearing, which was granted. The submission is now upon a reargument.

The primary question is whether such a system or any interest therein is at any time subject to taxation; and there is the further inquiry as to how far we are here bound by the decision of the state court. The original of the exemption statute under consideration, enacted in 1899 (Session Laws 1899, p. 221), was as follows:

"All irrigating canals and ditches and water rights appurtenant thereto, when the owner or owners of said irrigating canals and ditches use the water thereof exclusively upon land or lands owned by him, her or them: Provided, in case any water be sold or rented from any such canal or ditch, then, in that event, such canal or ditch shall be taxed to the extent of such sale or rental."

In 1912 this provision was amended to read as follows:

"The following property is exempt from taxation: * * *
"L. All irrigation canals and ditches and water rights appurtenant thereto, when the owner or owners of said irrigating canals or ditches use the water thereof exclusively upon land or lands owned by him, her or them and situated wholly within this state: Provided, in case any water be sold or rented from any such canal or ditch, then, in that event, such canal or ditch shall be taxed to the extent of such sale or rental." Session Laws 1912 (Sp. Sess.) p. 23.

And again there was an amendment in 1913, so that the provision now reads:

"Irrigation canals and ditches and water rights appurtenant thereto when no water is sold or rented from any such canal or ditch, only to the extent that the water conveyed by such canal or ditch is used to irrigate lands within this state: Provided, that in case any water be sold or rented from any such canal or ditch to irrigate lands within this state, then, and in that event, such canal or ditch shall be assessed for taxation to the extent that such water is so sold or rented." Session Laws 1913, p. 173.

It is not improbable that the first amendment had its origin in the facts disclosed in the case of Spokane Valley Land & Water Co. v. Kootenai County (D. C.) 199 Fed. 481 (decision rendered August 19, 1912), and it is also not improbable that the second amendment was made to give greater precision to one of the ambiguous features pointed out in that decision. However that may be, the provision as it now stands expressly declares what in that case the original section was construed to mean, and otherwise the law remains substantially unchanged. In all of the provisions the intent of the Legislature to divide irrigation systems into two classes, one exempt from and the other subject to taxation is clear. As is said in the Lincoln County Case, it is plain "that it was the intention of the Legislature to place ditches and canals from which water was sold or rented in one class, and those from which no water is sold or rented in a different class." And all the time, it may be added, both under the original provision and under the amendment, the principle of classification has been the same. This principle is that until a water right, by sale or dedication and use, becomes appurtenant to the land, and is owned directly or indirectly by the owner of the land, it shall be separately assessed, and that thereafter it shall be exempt; the reason for the exemption doubtless being that after the water right becomes attached to the land, it contributes its value thereto, and thus bears its proper burden of taxation in the assessment of the land.

Now, underlying the plaintiff's contention, if I rightly apprehend it, is the assumption (apparently indulged in the Lincoln County Case) that a Carey Act company is not the owner of the works that it constructs, or of its water rights. If the term "owner" is used in its ordinary sense, and such must be its meaning if the argument is to be given any validity at all, not only do I fail to see how the view can be maintained (so long as the water rights in the system are unsold), but to recognize it in all of its logical consequences will, as it seems to me, bring chaos into a branch of the law which already presents questions of the most perplexing character. That the holding or operating company to which the irrigating works ultimately pass never becomes the owner thereof in any real sense is to be admitted; for, after such transfer is made, its status is substantially that of the older type of co-operative canals referred to in Spokane Valley Land & Water Company v. Kootenai County (D. C.) 199 Fed. 481. It is only the holder of the naked title. And properly I think a like view may be taken of the status of the title in the promoting company after the water rights are sold, but before a formal transfer of the system is made to the operating company. In such case the promoting company has ceas-

ed to have any beneficial interest; the system equitably belongs to the owners of the lands.

But how can such a view be legitimately taken before water rights are sold? If at that time the promoting company does not hold and own the title and the entire beneficial interest, what is its relation to the property? It is suggested that its interest is represented by a lien, under section 1629 of the Revised Codes; but section 1629 does not purport to create or to relate to a lien upon the system for the cost of the construction thereof as fixed by the contract with the state, or a lien for the actual cost of construction, or to any lien upon the system. The liens therein provided for are given to the promoting company, as vendor, to secure the deferred payments due to it from the vendees of water rights; until a water right is sold, it is the owner of the entire system, and neither has nor needs a lien. As water rights are sold it is given a lien only in case the purchase price is not paid in cash, and then only upon each water right separately, for the deferred payment on account of the purchase price thereof, and upon the specific land for which such water right is sold and to which it becomes appurtenant. The language of the statute is:

"Any person, company or association, furnishing water for any tract of land shall have a first and prior lien on said water right and land upon which said water is used for all deferred payments of said water right."

It therefore appears that on making the sale of a water right the promoting company does not release such water right from a general lien covering the entire system, but alienates its title to the water right, and as security for the purchase price acquires a lien thereon, and upon the farm to which the water right attaches. It is the owner of, not a lienor upon, the system; it sells—it does not release—to the settler.

It is further suggested that serious complications might arise from the taxation of the system, because, in the case of delinquency, it would be sold, and the purchaser would be relieved from the obligations of the contract with the state; but it has become the established doctrine of this jurisdiction, both in the state and federal courts, that the promoting company may mortgage the system, and it may enter into contracts relative thereto by which laborers' and materialmen's liens will attach, and such mortgages and liens may be foreclosed, and title thus passed to a purchaser. It is not apparent how or why complications would be more serious in the case of a tax sale than in the case of a sale on foreclosure of a mortgage or other lien.

Now, bearing in mind that admittedly a corporation which owns an ordinary irrigating system in which water rights are sold is bound to pay taxes thereon, what substantial distinction, if any, can be drawn between such company and one which promotes a Carey Act project? While the latter is, for convenience, frequently referred to as the construction company, it is in my judgment more aptly termed a promoting company, for it not only constructs the works, but preliminarily it must acquire and assemble the essential elements of the system, such as water rights, rights of way, and reservoir sites, and, furthermore, it is under the necessity of negotiating the sale of water rights, which

in actual practice constitutes one of its most onerous functions. In short, the project is its enterprise, in the success or failure of which it alone is financially interested, and for the success or failure of which it is primarily responsible.

It will further be borne in mind that, while such a company is referred to as a Carey Act company, it is not meant thereby that it is a peculiar species of corporation. The designation implies only that the corporation happens to be engaged wholly or in part in providing water for the irrigation of lands under the Carey Act. There is nothing distinctive in the origin or in the form of the organization of such a company; it comes into being under, and exists by virtue of, the general corporation laws of the state. Section 1615 of the Idaho Revised Codes provides that "any person, company of persons, association, or incorporated company, constructing or having constructed, or desiring to construct, ditches, canals," etc., may enter into a contract with the state. It thus appears that an ordinary corporation, provided its purpose as defined in its articles be broad enough, may engage, either exclusively or partly, in Carey Act projects, and a system fully constructed under the general law of the state may after construction become a Carey Act project as the result of the execution of an appropriate contract between the owner and the state.

Now, in the light of these considerations, let us suppose a case: A corporation is organized with a purpose broad enough to authorize it to provide water for irrigating purposes, either by open sale, upon such terms as may be agreed upon with settlers whom it may persuade to settle upon the lands to which it proposes to conduct the water, or under the procedure prescribed by the Carey Act. Suppose, further, that this company decides to bring the water to township 4 under the former plan, and to the adjacent township 5 under the latter plan. It goes to a neighboring stream, makes two surveys as the bases for applications for water permits, makes the applications, and secures the two permits, one for the one system and the other for the other. After the necessary surveys, it acquires by purchase and by proceedings in eminent domain rights of way for the necessary dams, ditches, and reservoirs for each system. Thus far its procedure is precisely the same in both cases, and its rights and titles are identical. It thereupon applies to the state land board and secures the segregation of the lands in township 5, under the Carey Act, and enters into the usual contract, the distinctive feature of which (for such is the gist of the Carey Act) is that, in consideration of the assurance that no one will be permitted to acquire lands in this township who has not first purchased a water right from the corporation, thus eliminating the possibility of a competitive enterprise, it will sell water rights to all actual settlers at not to exceed $40 per acre. Thereupon it completes its system and offers for sale its water rights at $40 per acre, with the further understanding, as is the custom, that the purchaser acquires an undivided proportionate interest in the canal system and the water right, the same to be evidenced by stock in the operating corporation, to which the legal title will be conveyed when the capacity of the system has been fully sold.

Now suppose, further, that the corporation, being in control of what it deems to be the only feasible right of way by which water can be carried to township 4, and therefore being without fear of competition, sees no advantage in contracting with the state under the Carey Act relative to this project, and hence proceeds independently to construct the other system under the general laws of the state, and upon its completion advertises that it will sell water rights at the same rates and upon the same terms as under its Carey Act project, and that the purchasers will acquire proportionate interests in the system and water right, the legal title to which will be conveyed to an operating company, in which they will hold all of the stock, as soon as all of the rights are sold, just as in the case of the Carey Act project. Now undoubtedly this latter system, upon its completion, and at least until the water rights are sold, falls within the taxable class of canals as defined in the statute. Indeed, at this stage it is typical of that class. But in what respect is it different from the other system owned by the same company, and why should it be taxed and the other go free? Is not the ownership in both cases of precisely the same origin and quality, and is not the sale of water rights identical in all essential respects? If it be said that on the Carey Act system the corporation does not become the absolute owner of the water rights, because it does not and cannot apply the water to a beneficial use, the statement is equally true of the other project. Hard v. Boise City, etc., 9 Idaho, 589, 76 Pac. 331, 65 L. R. A. 407.

Let us carry the illustration a little further, and suppose that, after the corporation has fully completed its system for the irrigation of the lands in township 4, it does not find a ready sale for its water rights, and it learns that there is another feasible source from which the lands may be irrigated, and it is threatened with a competitive system. Accordingly for protection it applies to the state land board for a segregation of the lands, and enters into a contract with the state by which the project is turned into a Carey Act project. Its system is taxable the moment before it enters into such contract. Upon what theory does it cease to be taxable the moment after? The contract, presumably, is not burdensome, but beneficial, to the company. It is the owner of its dam and diverting works, its rights of way, canals, and reservoirs, the moment before the contract is executed. In what manner does it become divested of such ownership the moment after? If it loses title, either legal or equitable, to whom does such title pass?. The project is dedicated to a public use before the contract is entered into, and is charged with the burdens and obligations of such use; it continues to be so charged. Before the contract, upon receiving reasonable compensation therefor, the corporation is under obligation to furnish water to all persons in need thereof. Wilterding v. Green, 4 Idaho, 773, 45 Pac. 134; Shelby v. Farmers' Co-op. D. Co., 10 Idaho, 723, 80 Pac. 222; Bardsly v. Boise City, etc., 8 Idaho, 155, 67 Pac. 428. Such is its obligation after the contract with the state, the only difference being that in the latter case it agrees beforehand that the reasonable compensation will not exceed a specified amount. In either case it is the sole beneficiary of the entire value of the system. The

proceeds of the sale of all water rights without diminution go into its treasury and belong to it absolutely. If the water rights are not all sold, it, and it alone, suffers the loss. Even in case of a forfeiture of its contract it is entitled to the net proceeds of the sale of the system. Revised Codes Idaho, § 1623. It may mortgage, incur liens upon, and transfer the property, the same in one case as in the other. In either case it may bring and defend actions affecting its title as well to its water right as to its rights of way and constructed works. Its relation to the project is as essentially that of ownership in the one case as in the other. In both cases such relation has all the attributes of ownership; the only qualification being that in the one case interests in the nature of water rights are to be sold for a stipulated price, presumably a reasonable price, in consideration of the protection which the company thus gets against competition. But this limitation upon the power of disposition in no wise affects the quality of or impairs its title. The state of Idaho is none the less the owner of its grant lands because there is attached to the grant the condition that the land shall not be sold for less than $10 per acre. An absolute grant to a railroad company is not held nontaxable because of the condition that the land shall be sold to settlers for $10 per acre.

In no real sense is a Carey Act corporation an agent of the state, or a trustee for the state or for the settlers. Its obligations are such, and such only, as it assumes in its contracts, or such as are imposed upon it by the law relating to public service corporations. To it, of course, is applicable the fiction that in the administration of a public use the corporation is the agent of the state, as, for example, in the acquisition of rights of way, through proceedings in eminent domain; but that consideration is quite immaterial.

While it thus appears that I still adhere to the view upon which the cause was originally submitted and decided, I am inclined to think that, in so far as concerns the present issue, the Lincoln County Case should be regarded as controlling. The general rule is that the federal courts will follow the decisions of the highest court of the state in the construction of a local statute. The rule is subject to certain exceptions, but here no vested rights of the private citizen are involved, and no other reason for making an exception is apparent. The revenue laws of a state are peculiarly of a local character, and it is of the highest importance that they operate uniformly and be enforced against all alike; with a variance in the judicial decisions this, of course, would be impossible. In deference, therefore, to this rule, I must, upon the authority of the Lincoln County Case, grant the relief prayed for. It may be added that the result works no injustice, for when the levy was made it is thought that in fact the plaintiff had no residual beneficial interest in the system. I have been at some pains to make plain my views upon certain phases of the controversy only in order to avoid misapprehension touching related questions, which are more or less constantly arising out of Carey Act transactions, and as to which the general rule here followed is not deemed to be controlling.

Let a decree go for the plaintiff as prayed.